```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                            :
TROY PIROLOZZI,                             :   CASE NO. 5:07-CV-798
                                            :
         Plaintiff,                         :
                                            :
vs.                                         :   ORDER & OPINION
                                            :   [Resolving Doc. Nos. 195, 196, 197, 198,
ERIC STANBRO, ET AL,                        :    200, 201, 202, 203, 216]
                                            :
         Defendants.                        :
                                            :
------------------------------------------------------
```

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On March 23, 2009, Defendants City of Canton, Eric Stanbro, William Guthrie, Jerry Fuelling, and Shawn Overdorf (collectively "the Canton Defendants") moved this Court to limit the expert testimony of Plaintiff Troy Pirolozzi's expert witnesses: Dr. Werner Spitz and Dr. Robert Stark, [Doc. 195]; Dr. Robert Ancell and Dr. Michael Thomson, [Doc. 196]; and Francis Murphy and W. Ken Katsaris, [Doc. 197]. On the same day, Plaintiff Pirolozzi moved this Court to exclude the expert testimony of the Canton Defendants' expert witnesses Dr. Vincent DiMaio and Dr. Tom Neuman. [Doc. 198.]

On March 24, 2009, Plaintiff Pirolozzi moved this Court to prohibit evidence of or argument that the individual Defendant Officers were not prosecuted, [Doc. 200], to prohibit the Canton Defendants' experts from testifying the jury should take into account social security benefits payable to the deceased's children, [Doc. 201], to prohibit the introduction of photographs of the deceased's home, [Doc. 202], and to provide an attached jury questionnaire to prospective jury members prior to trial, [Doc. 203]. Finally, on April 9, 2009, the Canton Defendants moved this Court to strike some of the attachments to Plaintiff Pirolozzi's response to the Defendants' motion in limine

Case No. 5:07-CV-798
Gwin, J.

regarding Dr. Spitz and Dr. Stark. [Doc. 216.]

On April 13, 2009, the Court held a hearing as to the various pending motions in limine. After considering the parties' arguments, the Court concludes that the testimony of experts Spitz, Stark, Ancell, Thomson, DiMaio, and Neuman is admissible.  The Court therefore **DENIES** both parties' corresponding motions to exclude. [Docs. 195, 196, 198.] The Court also finds that the Plaintiff's attachments responding to the motion regarding Dr. Spitz and Dr. Spark are admissible, and so **DENIES** the motion to strike the attachments. [Doc. 216.]  The Court **DEFERS** judgment on the testimony of experts Murphy and Katsaris, with the motion to be renewed at trial. [Doc. 197.] The Court further **GRANTS** the motions prohibiting argument that the individual Defendant Officers were not prosecuted and that the jury should take social security benefits payable to the deceased's children into account. [Docs. 200, 201.] Finally, the Court **DENIES** the motion to exclude the photographs and **DENIES** the motion for the use of the Plaintiff's proposed jury questionnaire. [Docs. 202, 203.]

## DAUBERT MOTIONS

*Legal Standard*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, testimony based on specialized knowledge is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  The Rule sets three additional prerequisites to admissibility:

(1)  the testimony must be "based upon sufficient facts or data,"
(2)  the testimony must be "the product of reliable principles and methods," and
(3)  the witness must have "applied the principles and methods reliably to the facts of the case."


Case No. 5:07-CV-798
Gwin, J.

*Id.* As commentators have noted, Rule 702 evinces a liberal approach regarding admissibility of expert testimony. *See, e.g., Weinstein's Federal Evidence* § 702.02, at 702-6. Under this liberal approach, expert testimony is presumptively admissible. *Id.* Further, experts need not confine their testimony to matters upon which they have personal knowledge. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

Rule 703 governs the facts or data upon which an expert may base his expert testimony. So long as the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," the basis for an expert's testimony need not be admissible as evidence at trial. In other words, expert witnesses may base their testimony on inadmissible materials, and if those materials are reliable in the expert's field, their inadmissibility does not stop the admissibility of the expert's testimony. Thus, reliability is the cornerstone of Rule 703.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that trial courts are to perform a "gatekeeper" function regarding the admissibility of scientific experts, and created a series of factors for courts to apply in determining reliability. Among these factors are:

- Whether the theory or technique that serves as the basis for the proposed expert testimony can be or has been tested
- Whether the theory or technique has been published and subjected to peer review.
- The known or potential error rate experienced in the application of the particular technique.
- Whether the theory or technique is generally accepted in a definable relevant community.

*Id.* at 593-94.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended the gatekeeper function of district courts to cover non-scientific expert testimony. With regard to the

Case No. 5:07-CV-798
Gwin, J.

*Daubert* factors, however, the *Kumho Tire* Court stated,

> We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Id.* at 141-42.

For the instant *Daubert* motions, the Court restricts itself to determining whether the experts' purported testimony is admissible. To conduct this inquiry, the Court examines the prerequisites listed in Rule 702 and also asks whether the basis underlying the testimony meets the Rule 703 reliability criterion.

*Drs. Spitz and Stark*

The Defendants move the Court to limit the testimony of the Plaintiff's medical experts, Dr. Werner Spitz and Dr. Robert Stark, on the issue of the cause of Shawn Pirolozzi's death, both because their testimony is not based on reliable scientific methods or principles and because, in the case of Dr. Stark, "he does not have the necessary qualifications to opine on asphyxia [the alleged cause of death]." [Doc. 195 at 1-2.]

Generally, the Defendants argue that there is no scientific experiment supporting the theory of compressional asphyxiation in cases like this one, where a subject is held down by police officers. To support this conclusion, the Defendants rely on the scientific studies of their own expert, Dr. Tom Neuman, who has found that weight placed on the back of subjects does not affect the ventilatory response to exercise, or the amount of oxygen in the blood. [Id. at 7-8.] Without refuting the existence of positional or compressional asphyxiation, the Defendants argue that "[t]his case is a

Case No. 5:07-CV-798
Gwin, J.

question of degree." [Id. at 16.] Allegedly, there is an analytical gap between this case and the kinds of circumstances under which asphyxiation can occur, and the Defendants argue that the Plaintiff's medical experts have employed no reliable scientific methodology to bridging that gap. [Hearing transcript.]

Specifically, Dr. Spitz intends to testify that the decedent died from compressional asphyxia, because due to his emotional condition - his "fear of impending doom" - the decedent required more air than he otherwise would. [Id. at 8.] The Defendants challenge this theory first on the basis of qualification, arguing that because Dr. Spitz is not a pulmonologist, he cannot testify regarding how much oxygen a person needs to live. [Id. at 9.] Nor, according to the Defendants, is Dr. Spitz, as a pathologist, qualified to opine on the mental state of the decedent, whether he was experiencing "fear of impending doom." [Id. at 11.] Further, on the issue of reliability, the Defendants argue that Dr. Spitz "has no scientific basis to conclude that one's state of mind creates the need for more oxygen." [Id. at 11.] To this end, the Defendants note the total absence of scientific experiments testing such a theory. [Hearing transcript.]

As to Dr. Stark, the Defendants challenge his qualifications because he is a cardiologist and not board certified in pathology, pulmonary medicine, or emergency medicine. [Id. at 13.] Further, the Defendants allege that Dr. Spark has neither conducted his own research on aspyhxia, nor is he familiar with the vast array of research in the field. [Id.]  Therefore, he cannot present reliable expert testimony on the issue.

Defending his medical experts, Plaintiff Pirolozzi notes the impossibility of replicating the circumstances of a case like this for the purposes of scientific testing. [Doc. 214 at 1-2.]  In the absence of such simulations, however, the Plaintiff contends his experts can rely on principles of

Case No. 5:07-CV-798
Gwin, J.

medicine and their own experience in similar situations to form reliable opinions. [Id. at 2.] In support of the validity of the relationship between positional asphyxiation and the prone restraint, Plaintiff Pirolozzi offers several articles involving case studies. [*See* Doc. 214, Exs. C, D, E, F, G, H.] Further, the Plaintiff challenges the Defendants' reliance on the work of Dr. Neuman and his involvement in similar cases, because the Neuman studies were allegedly conducted in anticipation of litigation. [Hearing Transcript.] As the Plaintiff points out, courts have allowed evidence of restraint asphyxia as a cause of death since Neuman's work began. [Doc. 214 at 12 (citing, *e.g.*, *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1017 (S.D. Ohio 1999).] The Plaintiff concludes that Dr. Spitz and Dr. Stark are qualified physicians who relied upon their experience and training, supported by the medical literature, to form their opinions, and as such, their testimony should be admitted.

   The Court first addresses the question of the doctors' qualifications to testify. Rule 702 considers "knowledge, skill, experience, training, or education" of experts, and Dr. Spitz and Dr. Stark have a sufficient combination of these factors to be able to testify in this case. Dr. Stark is board certified in both cardiology and internal medicine, and has vast experience from his actual treatment of patients. The Court finds that cardiology and the circulation of blood is a relevant issue in this case, depending on what the cause of death is found to be. Dr. Stark is therefore qualified to testify as to certain matters, although he may not be qualified regarding every issue. The Defendants are free to renew the motion concerning Dr. Stark during trial as to particular lines of testimony, should the need arise. Dr. Spitz, as a board-certified pathologist, is qualified to testify as to the cause of death in this case. The Court agrees that the doctors may not be able to testify as to the mental process of the decedent, but generally they are qualified to testify.

Case No. 5:07-CV-798
Gwin, J.

With respect to the reliability of both Dr. Stark and Dr. Spitz's expert testimony, to the extent that they rely on a theory of asphyxia as the cause of death, the Court also finds both experts' testimony admissible.  The simple fact that the experts do not have lab results supporting their theory is insufficient to render their testimony unreliable.  If, as both doctors testify, the mental or emotional state of the subject is a factor in death by asphyxia, it would be nearly impossible to simulate the extreme circumstances of police restraint in scientific experiments.  And in looking to the scientific literature, the Court finds sufficient support for the idea that excitement, fear, psychosis, and drug use all may affect the body's need for oxygen, and thereby the possibility of asphyxia. [*See e.g.* Doc. 214, Ex. E, *Reenactment of Circumstances in Death Related to Restraint*; Ex. C, *Asphyxia Death During Prone Restraint Revisited*] Although these articles involved case studies rather than lab experiments, they were nonetheless published in the *American Journal of Forensic Medicine and Pathology*, a peer-reviewed publication. The materials thus meet one, if not another, of *Daubert*'s reliability factors.  In its flexible discretion, the Court finds this evidence sufficient to admit the experts' testimony on the theory of asphyxiation as the cause of death.

Further, as discussed below, the Court notes that the Plaintiff raises questions as to the admissibility of the Defendants' experts' testimony on the same issue, arguing that Dr. Neuman conducted his scientific studies for the purposes of litigation and the results are therefore suspect. If the jury agrees and finds Dr. Neuman to be unbelievable because he is a hired gun and finds his experiments to be fraudulent because his subjects knew the circumstances of the experiment and so were no actually afraid, the jury could then choose to believe the Plaintiff's experts instead.  If the jury agrees with the Defendants that the analytical gap cannot be adequately bridged to support the asphyxiation theory, they can choose to believe the Defendants' experts.  Ultimately, the questions

-7-

Case No. 5:07-CV-798
Gwin, J.

regarding the experts are questions of weight that should be given their testimony, which is the province of the jury to decide, rather than the reliability of the testimony.  It is not up to the Court to decide between the battling experts.  *See Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir.1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.")  The Court finds the testimony of Dr. Spitz and Dr. Stark to be sufficiently reliable on the theory of asphyxia as to be admissible.

*Drs. DiMaio and Neuman*

The Plaintiff seeks to exclude the testimony of the Defendants' medical experts, Dr. Vincent DiMaio and Tom Neuman, as to the cause of death. [Doc. 198.] Although he stipulates to the experts' qualifications and the relevance of their testimony, the Plaintiff objects on the grounds of reliability. [Hearing Transcript.]  DiMaio and Neuman intend to testify that the cause of death was not asphyxiation, but, according to DiMaio, excited delirium.  The Plaintiff challenges the studies replied upon by these experts because they do not replicate the real world conditions of struggles between police officers and arrestees and because they were allegedly initiated for the purposes of litigation. [Id. at 3.]

First, the Plaintiff argues that these studies relied upon flawed scientific methodology in that they ignored, or even purposefully eliminated, the effects of stress and psychiatric illness on the body's functioning in such a situation. [Id. at 9.] Moreover, the subjects in the studies were obviously aware, as participants in a scientific study, that they would not be harmed during the course of the study. [Id.] They were thus missing the crucial element of fear.  The Plaintiff contends that it is in fact impossible to test the relevant circumstances in a simulated scientific study. [Id. at 9-10.] Although Dr. Neuman alleges the studies are sufficient because none of the "real world factors" (as

Case No. 5:07-CV-798
Gwin, J.

dubbed by the Plaintiff) affect a person's ability to breathe, the Plaintiff cites to Dr. Neuman's 1997 study that seems to contradict that assertion, admitting that a combination of factors - including struggle, stress, and fear - could have resulted in "respiratory compromise" that would have gone undetected in the study. [Id. at 10-11.]

Second, Plaintiff Pirolozzi argues that Dr. Neuman's scientific studies on the subject of asphyxiation are suspect because they were conducted for the purpose of testifying on the behalf of defendant police officers in § 1983 excessive force cases. [Id. at 3-6.] The first study, conducted in 1997, was directly developed for litigation, *Price v. County of San Diego*, 990 F.Supp. 1230 (S.D. Cal. 1998), and then following studies in 2004 and 2007 were "financed by defendants in lawsuits or entities who have an interest in the defense of law enforcement officers who are sued for the use of excessive force." [Id. at 6.] Because these studies did not "flow naturally" from an expert's line of scientific work, the Plaintiff argues they are unreliable. [Id. at 14.]

In opposing the motion to exclude the testimony of Dr. DiMaio and Dr. Neuman, the Defendants assert that Dr. Neuman's several studies investigating the physiological effects of restraint positions on ventilation and blood oxygen levels were not prepared solely for the purposes of litigation. [Doc. 211 at 2.] While the 1997 study was conducted for purposes of the *Price* litigation, the 2004 and 2007 studies were funded by external sources unrelated to any litigation. [Id. at 5.] Moreover, the Defendants argue that the studies are not flawed because the "real world" conditions missing in the studies - such as fear and mental illness - are physiologically irrelevant to ventilation. [Id. at 6.] Based on his expertise as a pulmonologist, the Defendants argue Dr. Neuman could testify to this fact generally without even relying on the tests he conducted. [Hearing Transcript.] For these reasons, the Defendants assert that the testimony of Dr. DiMaio and Dr.

-9-

Case No. 5:07-CV-798
Gwin, J.

Neuman passes the *Daubert* test for reliability.

As discussed above in the context of the testimony of Dr. Spitz and Dr. Stark, the Court finds this to be an issue primarily of the weight to be accorded the experts' testimony, rather than the admissibility of the testimony. Although the first study by Dr. Neuman was initiated solely for the purposes of litigation, the same is not clearly true of Dr. Neuman's following studies. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007) (considering the *Daubert* factor of scientific studies being "expressly" or "solely" prepared for purposes of testifying). Regardless, that is only one factor to be considered, and the testimony of Dr. DiMaio and Dr. Neuman amply meets the other reliability factors of testing, peer-review publications, and acceptance in the scientific community. Moreover, Dr. Neuman, as a pulmonologist, would be qualified to testify regarding the asphyxia theory based on his education and experience alone, even without the results of his studies. Therefore, the Court finds the testimony of both Dr. DiMaio and Dr. Neuman to be sufficiently reliable as to be admissible.

*Drs. Ancell and Thomson*

The Defendants also move the Court to limit the testimony of the Plaintiff's experts on economic issues, Dr. Robert Ancell and Dr. Michael Thomson. [Doc. 196.] In particular, the Defendants challenge the testimony to the extent that it does not properly consider all factors relevant to future economic losses. The Defendants rely on the Ohio wrongful death statute, O.R.C. § 2125.02(B), and Ohio caselaw interpreting the statute to require that any calculation of lost earnings be reduced for personal consumption costs. [Doc. 196 at 3-4.] With respect to Dr. Ancell, the Defendants claim that his report merely summarizes general data without any application to the specific facts and circumstances of the Pirolozzi situation. [Id. at 4.] As to Dr. Thomson's report, the

Case No. 5:07-CV-798
Gwin, J.

Defendants find it unreliable because it depends on baseless assumptions and does not factor in the decedent's disability at the time of death, his risky behaviors, or an offset for personal consumption, among other factors. [Id. at 5.] Further, the Defendants challenge Thomson's testimony that considers the decedent's children's potential future earnings loss, arguing it does not rely upon a cognizable economic theory of recovery. [Id.] The Defendants therefore conclude that the testimony of Dr. Ancell and Dr. Thomson is unreliable.

In response, Plaintiff Pirolozzi argues that the objections to the expert testimony of Ancell and Thomson pertain to the weight of each experts' testimony, but not admissibility. [Doc. 212.] Refuting the Defendants' description to the contrary, the Plaintiff contends that Dr. Ancell did in fact consider the decedent's relevant employment history, his medical records, and other personal factors to determine his earning capacity. [Id. at 3.] According to the Plaintiff, Ancell could only predict the decedent's future earning *capacity*, without being able to guarantee that the decedent would have returned to work. [Id. at 4.] Likewise, the Plaintiff argues that Dr. Thomson could only testify to lost earning capacity, without being able to predict if the decedent would have returned to work or for how long. [Id.] With regard to the children, and their potential lost earnings if they do not attend college, the Plaintiff explains that the argument is not that the children will not be able to afford college without the financial contribution of their father, but that they will be less likely to attend without the emotional support of their father. [Hearing Transcript.]  The Plaintiff admits these experts' conclusion would be subject to cross-examination, but argues that they should nonetheless be admitted into evidence.

Noting that both parties will have expert testimony on these economic issues, and that both parties can cross-examine the other's experts, the Court finds the testimony of Dr. Ancell and Dr.

-11-

Case No. 5:07-CV-798
Gwin, J.

Thomson to be admissible. With respect to the specific issue of the Ohio wrongful death statute and the need to deduct personal consumption from lost earning capacity, the Court concludes that these issues go to the weight of Ancell's and Thompson's testimony, not the admissibility of their testimony.

The Court next considers the issue of whether the decedent's children can recover a loss of their own potential earnings on the theory that the loss of consortium of their father, in terms of emotional support, will make them less likely to attend college. Without the experts present at the *Daubert* hearing to testify as to the reliability of this theory and whether there exists peer-reviewed literature on the topic, the Court defers a ruling until trial. The economic experts are permitted to testify generally, but the Court will separately voir dire before the experts testify on this specific theory.

*Murphy and Katsaris*

Finally, the Defendants move to limit the testimony of the Plaintiff's police practices experts, Francis Murphy and W. Ken Katsaris. [Doc. 197.] The Defendants point out that in an opinion and order dated May 1, 2008, this Court denied in part and granted in part the Defendants' motion for summary judgment. [*See* Doc. 144.] In that order, the Court dismissed the Plaintiff's claims regarding the City of Canton's training program and the use of excessive force, particularly with respect to striking an individual in the jaw. The Court granted summary judgment to Defendant City of Canton concerning its general police training program, finding that the program does not condone or endorse excessive force. [Id. at 21.] The Defendants anticipate that the Plaintiff's experts Murphy and Katsaris will offer testimony as to these issues already decided by the Court. [Doc. 197 at 3.] Because the issue have already been resolved, the Defendants argue any such evidence is irrelevant.

Case No. 5:07-CV-798
Gwin, J.

[Id.] Further, the Defendants contend that the expert testimony offered by Murphy and Katsaris as to the use of excessive force consists of nothing more than conclusory legal conclusions and invades the fact-finding province of the jury. [Id. at 3-7.]

Plaintiff Pirolozzi responds that his experts will not testify as to whether the Defendant Officers acted in an objectively reasonable matter, as that is indeed the province of the jury. [Doc. 213.] However, Murphy and Katsaris will testify as to acceptable police practices, refuting claims made by the Defendant Officers regarding the purpose or acceptability of their conduct. The Plaintiff also claims the experts will testify as to the adequacy of the City of Canton's police training. The Plaintiff argues that nothing prevents expert witnesses from testifying regarding facts that are in dispute.

Because it is unclear at this time exactly how this evidence will be presented at trial - whether as an issue regarding failure to train or authorization of excessive force or in some other way - the Court defers a ruling on this matter until trial. The Court asks the parties to renew the motion to exclude specific testimony of Murphy and Katsaris if, at trial, the parties believe the experts are steering towards testimony that is improperly admitted.

## MOTIONS IN LIMINE

*Legal Standard*

According to the Federal Rules of Evidence, relevant evidence is generally admissible. Fed. R. Ev. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Ev. 403.

Case No. 5:07-CV-798
Gwin, J.

*Fact that Defendant Officers Were Not Prosecuted*

Plaintiff Pirolozzi objects to the introduction of evidence regarding the fact that the Defendant Officers were not criminally prosecuted for the death of Shawn Pirolozzi. The Plaintiff says that the fact that the Defendant Officers did not commit a crime is irrelevant to the primary question in this case - whether the Defendant Officers used excessive force - because the elements and burdens of proof in criminal and § 1983 cases are different. [Doc. 200.] Further, the Plaintiff argues that even if such evidence is relevant, it would be more prejudicial than probative and could confuse the jury. [Id.]

In opposing the motion, the Defendants respond that in previous filings, the Plaintiff has implied a cover-up or bias on the part of the Canton Police Department and/or the County Prosecutor. [Doc. 208.] As such, the Defendants point out that an independent grand jury no billed the case. [Id.] In the event that the Plaintiff pursues a theory of a cover-up at trial, the Defendants argue that evidence that the Officers were not prosecuted criminally based on the actions of an independent grand jury may become relevant. [Id.]

As the parties agree that this issue need not necessarily come up at trial, the Court will, as an interim ruling, defer ruling upon the motion to exclude any testimony that the Defendant Officers were not prosecuted. If circumstances change at trial, the issue can be raised again. For the time being, however, the Court encourages the Plaintiff to stay away from the subject and any need to revisit the ruling.

*Social Security Benefits*

Plaintiff Pirolozzi also moves this Court to exclude evidence at trial of the social security benefits that the children of the deceased currently receive as a result of his death. The Plaintiff

Case No. 5:07-CV-798
Gwin, J.

admits that this may become a relevant issue at a later time, because Ohio law instructs that the amount of any collateral benefits the claimants are entitled to shall be deducted from any award against a political subdivision recovered by the claimaint. The Plaintiff merely argues that this deduction should occur after the trial, so as not to confuse the jurors. [Doc. 201.]

In response, the Defendants argue that the children's receipt of the social security benefits is relevant evidence to the extent that the Plaintiff argues that the children have lost economic support by losing their father. [Doc. 207.] If the Plaintiff opens the door at trial by arguing that the children are worse off financially due to their father's death, the Defendants wish to present evidence of the social security benefits to refute such a theory. [Id.] Otherwise, the Defendants agree, in their filing and at the *Daubert* hearing, that a post-verdict proceeding would be sufficient to deal with the effect of the social security benefits on any eventual jury award. [Id. and Hearing Transcript.]

Again, the parties seem to agree at this point that the social security benefits should be dealt with as a post-trial matter. Therefore, the Court grants the motion to exclude evidence regarding the benefits at trial. If, during the course of the trial, the Defendants believe the Plaintiff has presented an argument that makes the benefits relevant, the Court may reconsider the motion at that time.

*Photographs*

Additionally, Plaintiff Pirolozzi moves the Court to exclude the introduction of photographs of the deceased's home taken by investigators after his death. [Doc. 202.] The pictures in question include photos of blood, presumably the deceased's, all over the apartment. [Id.] The Plaintiff argues that the photographs would only be prejudicial and confusing to the jury because: 1) all of the experts for both sides agree that the amount of blood loss of the decedent cannot be determined; 2) the blood loss did not affect or cause Shawn Pirolozzi's death; and 3) the Plaintiff stipulates to the fact that the

Case No. 5:07-CV-798
Gwin, J.

deceased suffered "some sort of psychotic break or illness" that caused irrational behavior and may have led to self-inflicted wounds. [Doc. 202 at 2.] The Plaintiff contends that the photographs are particularly prejudicial because an untrained jury might conclude that blood loss contributed to Shawn Pirolozzi's death. [Id.]

In response, the Defendants argue that the photographs are probative of factual issues in this trial. [Doc. 209.]  First, according to the Defendants, the deceased's blood loss prior to police involvement is relevant because "[t]he Stark County Coroner found that hypovolemia, or blood loss, was a contributing factor to Pirolozzi's death," a conclusion based, in part, on a visit to the scene, as depicted by these photographs.  [Doc. 209 at 2.] The Defendants contend that just because the other experts state that they do not have enough information to opine on whether blood loss contributed to the death, it is still a factual issue for the jury, based on the photos and the coroner's testimony. [Id.]  Second, the Defendants argue that the photographs are evidence relevant to the factual issue of the deceased's mental state, whether he was suffering from excited delirium, an issue debated by the parties' experts. [Doc. 209 at 3.] Specifically, the Defendants assert that "[t]he photographs depict and demonstrate how irrational, self-destructive, oblivious to pain and violent Pirolozzi was before confronting police." [Doc. 209 at 3.] Finally, the Defendants seem to imply that the photographs are evidence probative of the fact that the deceased represented a danger to the Defendant Officers and the community. [Doc. 209 at 3.]

The Court finds that the photographs of the deceased's residence are relevant to issues that will be argued at trial.  In particular, it seems that experts for each party will rely on evidence of the deceased's mental state in their testimony.  Although the photographs may be somewhat prejudicial, the Court does not find them to be unfairly prejudicial.  Therefore, the motion to exclude the

-16-

Case No. 5:07-CV-798
Gwin, J.

photographs is denied.

*Motion to Strike Attachments*

The Defendants move the Court to strike the attachments to the Plaintiff's response opposing the Defendants' motion to limit the testimony of the Plaintiff's medical experts, Dr. Spitz and Dr. Stark. [Doc. 216.]  In particular, the Defendants move to strike Exhibits C-J, except I, published articles on positional asphyxiation.  In support of their motion, the Defendants argue that the articles are hearsay and do not meet the learned treatise exception to hearsay because a proper foundation as to the authoritativeness of the sources has not been laid. [Id. at 2-3.] Further, the Defendants argue that according to Federal Rule of Evidence 803(18), learned treatises may be offered only for the purposes of direct and cross-examination, circumstances not present here. [Id. at 3.] Finally, the Defendants argue that introduction of this evidence at this stage violates Rule 26 of the Federal Rules of Civil Procedure, because it is too late for the Plaintiff's experts to only now explain their reliance on these theories. [Id. at 4-5.]

The Plaintiff responds by saying that the materials were only now offered because they are evidence to defend the Plaintiff's experts against the Defendants' motion to limit the expert testimony.  [Doc. 217.] The Plaintiff argues that such evidence does not qualify as hearsay because it is not offered to prove the truth of the matter asserted, but rather is offered to prove that peer-reviewed literature on the issue of the relationship between asphyxia and stress exists and that the relationship is recognized in the medical community. [Id. at 2.] Further, the Plaintiff explains that he did comply with Rule 26 regarding disclosure, but he could not have been required to anticipate the specific *Daubert* challenge and therefore preemptively cite literature supporting the theory. [Id. at 2-3.]

-17-

Case: 5:07-cv-00798-JG Doc #: 271 Filed: 05/20/09 18 of 19. PageID #: 3445

Case No. 5:07-CV-798
Gwin, J.

According to Federal Rule of Evidence 401, the Court makes its rulings on the admissibility of evidence unconstrained by the Rules of Evidence. Fed. R. Evid. 401. Therefore, the question of whether the articles are hearsay is irrelevant to the Court's inquiry. The Court will thus allow the introduction of the materials for the purposes of ruling on the *Daubert* challenges. If there is an attempt at trial to offer the journal articles under the learned treatise exception, the Defendants can raise the issue anew.

*Juror Questionnaire*

In another motion, the Plaintiff requests that the Court send out an attached questionnaire to prospective jurors before trial, to enable the parties' attorneys to participate in voir dire more efficiently. [Doc. 203.] The Defendants object to the use of the questionnaire, arguing that its length is burdensome and it inquires as to personal matters that are irrelevant to the case. [Doc. 205.] The Defendants also note that the Northern District of Ohio has an objective questionnaire that it sometimes distributes to prospective jurors pursuant to local rules. [Id.]

As the Court will not provide the requested questionnaire, the motion is denied. For voir dire, the Court will ask all of the questions. Each party has leave to file proposed questions, and the Court will ask those as it deems appropriate. After the Court has conducted the questioning, both parties will be afforded the opportunity to request that additional questions are asked of the panel as a whole or of specific individuals. With this methodology, the Court endeavors to pose all important questions to the prospective jurors.

## CONCLUSION

For the foregoing reasons, this Court **DENIES** both parties' corresponding motions to exclude Dr. Spitz, Dr. Stark, Dr. Ancell, Dr. Thomson, Dr. DiMaio, and Dr. Neuman. [Docs. 195,

Case No. 5:07-CV-798
Gwin, J.

196, 198.] The Court also **DENIES** the Defendants' motion to strike the Plaintiff's attachments to his response regarding Dr. Spitz and Dr. Stark. [Doc. 216.]  The Court **DEFERS** judgment on the testimony of experts Murphy and Katsaris, with the motion to be renewed at trial. [Doc. 197.]  The Court further **GRANTS** the motions prohibiting argument that the individual Defendant Officers were not prosecuted and that the jury should take social security benefits payable to the deceased's children into account. [Docs. 200, 201.] Finally, the Court **DENIES** the motion to exclude the photographs and **DENIES** the motion for the use of the Plaintiff's proposed jury questionnaire. [Docs. 202, 203.]

    **IT IS SO ORDERED**.


Dated: May 8, 2009           s/       *James S. Gwin*
      JAMES S. GWIN
      UNITED STATES DISTRICT JUDGE